Our third case is Melton v. I-10 Truck Center, Inc. Mr. Friedman. Thank you. Good morning. My name is Howard Friedman and I represent the plaintiff appellant in this case, Mr. Clennon Duane Melton. I have already reserved five minutes for rebuttal. This appeal arises from the district court's granting of a summary judgment on all three claims of Mr. Melton. I'll tell you which one I'm most concerned about and that is the hostile work environment claim.  And I'll tell you particularly what my concern is. So a lot of the ridicule and hostility directed toward racial minorities that at least is evidenced by this record looking at the evidence in the light most favorable to the plaintiff appears to concern racial minorities who are not necessarily the same racial minority as the plaintiff, right? So as I understand it, some racial minorities are referred to as not his. What do we do with that? Does that count and if you can help me with that, that would . . . I'll certainly try my best. First of all, I think it does count. I think it counts a lot especially in this case. First of all, this is a case about racial discrimination. Race discrimination is race discrimination. Mr. Melton, the only black employee there, certainly. But the other things that he had heard, the other hostile or that was part of the hostile environment were comments made against other black individuals who were customers. Also others who were non-white, dark-skinned individuals who also had been racial slurs made against them in his presence. So he's making the claim about racial discrimination. He is a member certainly of the race as a black man, but he is hearing about the environment where he is surrounded by those, whether they be supervisors or other employees, who are making racial slurs against him and others. And the other thing is that . . . And what we have in terms of what's directed specifically at him, as I understand it, is there's a reference to him as a boy.  That's a . . . Initiated the complaint, yes. Yes. That's one incident, right? Andrews, who's a supervisor, makes derogatory comments about racial minorities and refuses to serve racial minority customers and insists that Melton do so instead. Is that right? That's part of it. There's much more. Yeah. I want to go through all of them to make sure I've got them all. Well, Melton also is called the token by . . . But he doesn't hear that. He's not privy to that. Well, actually, that may be a disputed fact, but Melton claims . . . Well, I believe it's in his declaration. So beyond that, Your Honor . . . If it's not in the declaration, then it's not there. Is that right? I believe that to be the case.  But, you know, again, that almost goes down the path that we've said is also incorrect, what the district court did, which was try to compartmentalize these individual statements or these individual claims to suggest then that it may not have been hostile. We believe that to be incorrect because it's the totality of circumstances . . . Yeah, I agree with that. Look, I'm sympathetic to this claim, okay, Mr. Freeman? I'm not playing a gotcha game. We've never held . . . Our court has never held that racially hostile comments, ridicule, mocking, whatever, discriminatory comments about other racial minorities counts for a person who is the object of at least some of the racially discriminatory comments. What I'm trying to do is grapple with how we deal with that. It's really important that we have held that you have to have been personally aware of the commentary about which you're complaining. That it has to have been in your presence. That it has to be, if not directed at you, at least you're hearing it when it's made as to other members particularly of your race, that's easy. But what do we do if it's directed at another racial minority of which you're not a member of the group? Well, I understand that except here we do have some . . . I'm going to use the term, obviously, some direct evidence of it. There is that direct statement of being called boy. There is, what I would suggest to this court or argue to this court, the direct comment of token. There is also, in this instance, you know, he being Mr. Melton, believed himself to be the subject matter of a lot of this hostility. There were also references to other black customers that there were comments made about, you know, where did they get their money? Those kinds of things. He's certainly a clear member of that. Black customers where it was suggested that they must have obtained their cash from illegal activity. And then when you take that into context with everything else, because, again, yes, certainly Mr. Melton is black, but you also have other dark-skinned people coming in that, again, seem to be categorized in the same category, by the way, by Andrews, by the other supervisors and other employees. And although it's easy to sit there and say that, you know, looking back, he was correct on this feeling of hostility. But in this case, we know that. Why? Because after the action began and discovery was conducted, what then came out was that the same group was, in fact, referring to Mr. Melton in the N-word, referring to other customers in that way. It really was, really pointed it towards him. You've touched on something that I was concerned about. There was an allegation in the complaint that your client was referred to by the N-word, but it's not in his declaration. Is it because that was some kind of comment that was made behind his back? And if so, where do I find that in the record? So we're here on summary judgment record. We have to look for the evidence. It's not enough to rely upon the allegation in the complaint. I understood. If you're asking me whether or not Mr. Melton was ever called the N-word directly . . . Yes. I don't . . . Is there any evidence that he was? Well, not directly.  Not in his presence. Not in his presence. Okay. But during the material times, that is during the time in which, for instance, he claims that there was this hostile environment that led to retaliation, it was discovered that he clearly was amongst his other coworkers and by even the supervisors. He was referred to, but if you're asking me, is there anything in the record that he was . . . What I've been mainly concerned about is the hostile work environment claim, and so insofar as there's any evidence of it, I have to know about it for that purpose. You tell me, what evidence is there in the record that there was a reference to him using the N-word? Who made it? When? Where am I going to find that in the record? I don't know if there is anything. In fact, I . . .  But that's really frustrating. The reason we have oral argument in a summary judgment case is because we assume you know the record better than we do, and we have to parse . . . We get multiple claims, multiple arguments, and we've got to sort through it, so we invite the lawyers in to come and tell us more about this case than we already know. It seems to me like I know more about your case than you do. I'm frustrated by this. I want to know what is our evidence. Well, you have the direct evidence that he was called boy, which in and of itself is direct evidence with regard to that. I don't necessarily believe that he has to be referred to as the N-word in order . . . I agree with that, but your complaint alleged that the N-word was used, and my question is a simple one. Is there any evidence of that? It's a summary judgment record. As far as the direct evidence, I would say . . . You keep talking about it being direct evidence. I don't want to have a debate this morning about direct versus circumstantial evidence because I just don't think it's important, but that's not helping me very much. Well, I have a question about the termination and trying to clarify because it seems on one end the record shows that he quit, but now there's a debate about whether or not he was actually terminated. Then I'm wondering was he fired or was it some kind of constructive discharge? Regardless, there were reasons given for the termination that had to do with absences, coming to work late, debates about sharing commission. How do you address those non-discriminatory, arguably legitimate reasons? Well, first of all, what the district court did was clearly violate the proposition set forth in the Lee case by virtue of . . . What the court did was . . . First of all, the facts are he was fired. The defendant in this case always claimed he quit, never acknowledged that he was fired, only stated that for the purposes of a summary judgment, let's presume . . . Mr. Friedman, the problem with this argument is the defendant is entitled to assume on summary judgment that you got evidence that he was fired, either directly or by constructive discharge. They are entitled to argue, well, then there was a legitimate . . . even if their position is he quit. Your argument that they can't do that has to be wrong. Respectfully, I disagree, Judge, and here's the reasons why. Because what they did was . . . What the district court did was the district court found, okay, for purposes of this debate, he quit. I mean, he was fired. For the sake of the argument, this was a constructive discharge, but even so, we had legitimate nondiscriminatory reasons for doing it. You're saying because they take the position that he was not fired, they can't argue that. That is not right. They relied upon what they claimed to be nondiscriminatory reasons to terminate him that they themselves never relied upon. It's a hypothetical, and that's precisely what the Lee case suggests. They're assuming, as they have . . . as we have to do, they are assuming that you got enough evidence that this was a constructive discharge. What they're saying is this record also allows us, though, an inference that justifies that. That's precisely why it should have been left up to a jury. Any trial lawyer would have loved the idea, loved the opportunity to put that issue of credibility before it. To determine whether or not . . . What you have to do is show why that legitimate nondiscriminatory reason is, in fact, pretextual. We've alleged that it was pretextual. You've got to give us evidence for why that . . . what they have proffered as a legitimate nondiscriminatory reason . . . I know I'm well beyond my . . .  We have, and our evidence is . . . And that is? Well, our evidence is that immediately after the reference of Boye and the complaint being made, Andrews basically made it very clear to one of the other owners that he has to go. That owner then says that, yes, but we have to do it the right way. That then started everything in progress. From that date forward, Andrews was gone ahead and appointed as Melton's supervisor, was starting to go ahead and document things that were never documented before. Andrews then . . . or Melton's . . . Okay, I think we understand it. You've saved some time for rebuttal. Let's hear from Ms. Richardson. May it please the Court. Jennifer Shove Richardson on behalf of Appalese. I think you only put fourteen minutes up, Valerie. Go ahead, Ms. Richardson. Jennifer Shove Richardson on behalf of Appalese. I attend Truck Center. Brian Brickman and Jason Brickman. Can you go ahead and address, I think, what the Chief was raising about racial discrimination? You have an environment where you have only one African-American person who's witnessing comments being made, disparaging comments being made about people of color. Every person of color that you can imagine that comes through, arguably, is disrespected in some way. Why does it . . . in my understanding from the record, there are no disparaging comments against any white people. So it's only disparaging comments against people of color, including black people. Why would it be necessary to . . . disparaging comments made about other people of color when it comes to determining their sentiments about Mr. Melton? I would answer the Court in looking at the Yelling v. St. Vincent's case that this Court very recently decided. So the elements of a hostile work environment include belonging to the protected class, experiencing unwelcome harassment. Arguably, those comments contribute to that element. The third element is that the harassment was based on that individual's race. And these comments seem to go to national origin. Yeah, that's a description, though, where it's not that we were holding that commentary about other races or racial minorities doesn't count. That's just where we're evaluating it. We're the only allegation is about this particular plaintiff's race. So that doesn't seem to help very much. If you're a member of a racial minority, let's say it's a very small minority in the community, but you work in a workplace where everyone else is a member of the racial majority and you observe and experience hostility, ridicule directed at any racial minority, including your own. Some of that commentary is directed at you personally, but it's directed at any kind of racial minority who enters the business. Why doesn't that support a hostile work environment claim? You're saying because all these other comments are about, say, a dot head or a rag head are not members of your racial group, they don't count. That's what we should say as a matter of law? I think that would be going too far, right? I think those comments, I think where they play in is severity, right? So those comments should not be said in the workplace, period. I will agree with that proposition, but what was the impact? Those are pretty offensive racial slurs, aren't they? A hundred percent, Your Honor. No one is saying that those phrases are acceptable. This particular plaintiff is called Boy. We give every inference in his favor. We know the history of that term. Indians referred to as dot head. Arab Americans referred to as rag heads. When you start considering this stuff collectively, and the test is severe or pervasive, I'm having a hard time understanding why there's not enough here to go to a jury. The factors are frequency. We don't know how frequently these comments were made. If you look closely at his affidavit, he does not say that. Two, it's severity, right? These are inappropriate comments, but what is the severity as to Mr. Melton? Three, is it physically threatening? Well, the severity I thought was also included the fact that when people of color came into the business, Mr. Melton was the one told to service them because his white colleagues didn't want to. I think that is Mr. Melton's presumption, but I don't think there is evidence in the record saying that, aside from his own testimony. We can debate the presumption, but his statement is that every time, for the most part, a person of color comes in, they're disrespected by his colleagues, and then he's the one who's told to service them. How is that not a reasonable presumption? Well, I think it also comes down to how did this impact his employment, right? That's what I'm asking you, because then he's told to then service them, the people of color who come in, because his white colleagues don't want to. So now he's doing work that arguably they would do, but for what he's arguing, their racism. Well, and he gets paid for that work, right? He gets paid for that work. And so would they. They would get paid for that work as well, except they don't want to do it because they don't want to service clients of color who are coming and patronizing their business anyway, which is a whole other separate debate not before us. But he does have to show that this negative environment, this severe and pervasive environment, impacted his employment, and the testimony was that he was, as far as sales, he was doing fine in his employment. Well, I know there's a debate about whether he was constructively discharged, fired, or quit, but your clients concede a termination, but there's evidence in the record to say that they also found fault with his performance. And he's saying that fault was based on his race. So, again, how does that not impact his employment? But those problems with his employment were not related to who he was servicing, for example, as a customer, right? Ma'am, the reasons he argues that he's servicing those people is because his colleagues are racist. And then he gets reprimanded, and he's saying it's because they're racist. Then he gets fired, and he's saying it's because they're racist. So I think the way that the pleadings themselves lay out, it's he's saying their behavior impacted him negatively in the workplace. I think I'm struggling to see how servicing a certain kind of customer... I mean, obviously, that's not a good fact for us, but seeing the particular impact on Mr. Milton as negative for servicing individual customers, I think I am having difficulty seeing that. I see that. Yeah, so how would that be any different from... There's commentary, as I understand this record, that when black customers come in, there are negative comments suggesting that they obtained their money from some kind of illegal activity. That's not about Mr. Milton himself, but he's a black man, and that's the comment that's made about black customers. That would count, doesn't it? Well, I believe the context for that comment was the cash-based transactions. These are large commercial trucks. Cash-based transactions have to be sourced, right? These are financed deals. And Mr. Milton's presumption is that it's only for the black customers, but there is no evidence that, for example, white customers who want to pay all cash are not being asked, what is the source of your... Well, he says, I thought, that these comments are only made about black customers. Is that what he says? He says that, yes. And we have to take that as true, don't we? Yes. Okay. And if we do take that as true, as we must, you can draw a negative inference from that too, right? That the reason that they're making that kind of comment is a racially motivated reason. And they've offered a legitimate business reason for needing to know the source of cash-based transactions. So maybe that particular fact is disputed, but taken all together, he's not shown the severity and pervasiveness that is required for a hostile work environment claim. He says that all of this makes him extremely uncomfortable in his work, right? Yes, he does say that. Yeah, I'm not sure how, then, the comment that's made about, say, dot heads or rag heads, it doesn't count just as much as what is said about the comments about black customers getting their cash from illegal activity. He does have to show that these comments unreasonably interfered with his job performance. You're in an environment where you're the only African-American person in the business. People of color come through and they're talked to in this disparaging way. You're the one told to service them. You're called boy. Again, this is, as you said, we have to accept his allegations as true. And then there's also the allegations that even if he did come late, other white coworkers came late and were not disciplined. He was not given access to certain facilities, which he says made it difficult for him to perform his job. To your point, how did this impact your job? He says, I'm not able to access certain facilities. He says it's race-based. I think the record, there is a connection there in terms of what he's alleging and the impact on his performance. So I'm not sure that that's your strongest position to lean into, but I think it's more in terms of why collectively this does not constitute a pervasive, hostile environment. I think it goes back to the actual legitimate business reasons for that final meeting, whether it was going to be a final warning or termination. The environment that Mr. Melton has described, taking everything he says as true, doesn't explain why he's having a customer come to Florida to pick up a truck that is in Alabama. It does not explain why he does not complete his paperwork correctly and it has to be redone by the finance manager over and over. It doesn't explain his flippant attitude when these corrections are given to him and his response is sort of, it's not, I apologize for that error on the financing paperwork. I'll do better, right? It's disrespectful. Those are outlined on page 16. So what are we supposed to do with, because that was my question to opposing counsel, was that your clients did present some legitimate non-discriminatory reasons for the firing. Is there anything in the record to show that there were other employees who conducted or engaged in that same behavior who remained employed? No. Plaintiff did not do discovery on comparators or identify any comparators that had the same problems that he had that are outlined not just after April 9th when he makes the complaint about boy, right? There were problems before that. If you look at footnote 8 of the trial court's order, she outlines them. And similarly, they're outlined in detail at page 16 of the brief. But plaintiff doesn't do that work to identify that he's been treated differently than others who are in his equivalent position with equivalent disciplinary history, according to the same supervisor. And what do we do with this? I think it was an online chat room or discussion, which one, I think the timing might not be in his favor. But he says, I'm in this environment. I feel that people don't like me. It feels very hostile. He doesn't have all of the evidence at that point. He's just saying, this is the treatment I'm receiving. This is how it's making me feel. And then there's evidence to show that they actually were engaged in disparaging comments about him, which even though he didn't have awareness of those comments, he still says he felt those sentiments coming out of that kind of chat room. So what do we do with that post-filing evidence? Well, this court has held, for instance, in Perry v. Rogers, which is an 11th Circuit 2015 case, that the plaintiff cannot rely on things that happened to other people or comments he did not experience. That's true. But I think Judge Abboudi's point is that insofar as there's some kind of argument about credibility, credibility of his comments, the credibility of how offensive he thought the atmosphere was, the fact that this is what's also being said in writing behind his back is the sort of thing that perhaps a jury ought to be aware of to judge his credibility. I think that the trial court dealt with those appropriately in saying, except everything about him as true, right, that he said as true, at the end of the day you have these legitimate business reasons for the action that was taken, and he has not refuted them. He did not say, I told the customer the truck was in Alabama and they made a mistake, right? He did not say this was not my responsibility to tell the customer within 200 miles where the truck should be on the day that they come. He did not do that work, and it is required for all of the claims. It seems to me that you might have good reasons. What you're talking about may be reasons why we have to affirm the dismissal determination or retaliation claims. It's not entirely clear to me though what you do about that with respect to the hostile work environment claim. Does that make sense?  Any other questions? Okay, Ms. Richardson. Let's hear from Mr. Breedman. I think that what you said hits the nail on the head a bit more than I obviously was able to articulate it. It really is a credibility issue. And here the question is, can the employer go ahead and when they deny firing my client, rely upon what they claim to be other reasons why we could have and or should have fired him in this case? I believe that the answer to that is no and is held in the Lee case. Just so you know, and I don't cite unpublished opinions of ours, but in two unpublished opinions, we have done the exact opposite of what you're talking about. In a published opinion, the Seventh Circuit EEOC versus Our Lady of Resurrection explained that an employer has a right to offer a legitimate nondiscriminatory reason for its actions regardless of whether the employee quit or was fired. To the extent that you're going back to that argument. Well, except it's the issue of credibility. What I mean by that is that in this case throughout the entire pleadings, throughout the answers to interrogatories, throughout the deposition transcripts, the defendant denies that they fired him. And putting that before the jury and if the jury were to find that that position is not credible, then it suggests then these other reasons which by the way are in dispute as to whether or not they are legitimate reasons to have fired my client. They're nondiscriminatory in nature. They were in dispute. And it then raises the question as to who should then determine the credibility as to whether or not those reasons actually existed. It should be the jury. My suggestion though was about credibility was in terms of this lending credibility to his testimony about the racially hostile atmosphere. Sure. It didn't have anything to do with whether there was a legitimate nondiscriminatory reason. Although Mr. Melton would be testifying as to the falsity of some of those reasons which the defendant may be relying upon. Are you saying your client didn't have an opportunity to rebut that? Because I think that is the weakest part of your claim, right? It's that he was found to be late. He was found to have problems related to customer service. There were issues with the commission. What in the record did your client present to rebut any of that? Well, he stated that those instances were never raised to the extent that they were after he made the complaint that he was called boy on April 9th. It was only after things were put into effect where then Justin says, we're going to do it the right way. Andrews then was promoted to be a supervisor and then started going ahead and making the notations in the record of all of these things which is the reasons why we would argue is the pretext to any alleged firing if in fact the defendant . . . But he doesn't dispute that that was his behavior before the write-up started and that he doesn't dispute that it wasn't his behavior when the write-up started. He's doing things that the employer says you can't do in this job. I believe that the dispute is to the degree and the extent in which then the defendant was arguing that the plaintiff had done those things. There doesn't seem to be any dispute about what happened on August 5th. A customer arrives at I-10 expecting to pick up a truck. They discover the truck is at a sister business. Hundreds of miles away. Paperwork had not been completed. The sales manager at another business was frustrated about it. Had sent the customer to I-10 to get the truck. Emailed Jason to complain about the incident. All those things that are the immediately precipitating events of whether you want to call it quitting or him being constructively discharged, they happen and I don't see where there's any dispute about that happening. I don't believe that there's a dispute about that happening but I do believe that Melton gave certain explanations with regard to that which he would argue and we would argue at trial was not, did not rise to the level at that point in time which would have led to a termination anyway. Again, it's not really a question then as to whether or not Melton would win but rather who should make that determination and we believe that it should be the jury in this particular instance. Okay, I think we understand your case Mr. Freeman. We're going to move to our last one. Thank you. Okay.